# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fort Smith Division

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) Case No. 2:19-CM-3 |
| Information Associated With The DrChrono | ) |
| Inc. Account In the Name of Dr. Cecil W. | ) |
| Gaby DBA Gaby Pain Clinic, That Is | ) |
| Stored At Premises Controlled By | ) |
| DrChrono Inc. | ) |

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JAN 2 8 2019

DOUGLAS F. YOUNG, Clerk
By
    Deputy Clerk

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location):* **Information Associated With The DrChrono Inc. Account In the Name of Dr. Cecil W. Gaby DBA Gaby Pain Clinic, That Is Stored At Premises Controlled by DrChrono Inc., more particularly described on Attachment A.**

This Court has authority to issue this Warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

DrChrono Inc., located in the Northern District of California, with servers located in the Eastern District of Virginia, there is now concealed *(identify the person or describe the property to be seized):*
**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ■ evidence of a crime;

- ■ contraband, fruits of crime, or other items illegally possessed;

- ■ property designed for use, intended for use, or used in committing a crime;

- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

■ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Paul M. Smith, DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/28/19

_____
*Judge's signature*

City and state: Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

Property to Be Searched

This search warrant applies to all content and information contained in or associated with the DrChrono Inc. account in the name of Dr. Cecil W. Gaby dba GABY PAIN CLINIC, that is stored at premises owned, maintained, controlled or operated by DrChrono Inc., a company that accepts service of legal process located at 328 Gibraltar Drive, Sunnyvale, California, 94089, in the Northern District of California, with servers located in Ashburn, Virginia, in the Eastern District of Virginia.

**ATTACHMENT B**

**Particular Things to be Seized**

I.        Information to be disclosed by DrChrono Inc. includes information associated with

the DrChrono Inc. account in the name of Dr. Cecil W. Gaby DBA GABY PAIN CLINIC,

since the inception of the creation of the DrChrono Inc. account and any documentation

that predates the inception of the creation of the account, if any, in or on the DrChrono Inc.

server, through and including January 28, 2019.

To the extent that the information described in Attachment A is within the

possession, custody, or control of DrChrono Inc., regardless of whether such information

is located within or outside of the United States, and including any messages, records, files,

logs, or information that have been deleted but are still available to DrChrono Inc., or have

been preserved pursuant to a request made under Title 18 United States Code, Section

2703(f), DrChrono Inc. is required to disclose the following information to the government

for each account or identifier listed in Attachment A:

a.        All electronic medical records which may include, without limit, records or

information regarding patient personal health information, patient files, patient notes,

treatment of patients or treatment plans, patient medical history, medications prescribed to

patients and/or prescriptions, patient allergies, patient appointments, calendars and

calendar data to include patient appointments and other appointments, patient

demographics, patient laboratory test results, patient radiology images, patient vital signs,

patient personal statistics like age and weight, billing records, uploads of documents to

include patient documents or any other data, files, logs.

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account.

e.      All records pertaining to communications between DrChrono Inc. and any person regarding the account, including contacts with support services and records of actions taken.

II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1), to wit, prescribing controlled substances outside the course of professional practice and without a legitimate medical purpose as well as violations of Title 21, United States Code, Section 846, to wit, conspiracy to prescribe controlled substances outside the course of professional practice and without a legitimate medical purpose, involving GABY and/or the GABY PAIN CLINIC since the inception of the creation of the DrChrono Inc. account and any documentation that predates the inception of the creation of the account, if any, in or on the DrChrono Inc. server, through and including January 28, 2019, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      The prescriptions of medications by GABY and/or the GABY PAIN CLINIC to patients of GABY and/or the GABY PAIN CLINIC.

b.      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

c.      The identity of the person(s) who communicated with the user ID about matters relating to patients treated by GABY and/or the GABY PAIN CLINIC.

**III.    Means of Production**

DrChrono Inc., the provider, is hereby ordered to disclose the above information to the government within up to fourteen (14) days of service of this warrant, by sending to Drug Enforcement Administration, C/O: Task Force Officer Paul M. Smith at 4977 Old Greenwood Road, Fort Smith, Arkansas, 72903 via U.S. Postal Service or another courier service.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE INFORMATION ASSOCIATED WITH THE DRCHRONO INC. ACCOUNT IN THE NAME OF DR. CECIL W. GABY DBA GABY PAIN CLINIC, THAT IS STORED AT PREMISES CONTROLLED BY DRCHRONO INC. | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR
SEARCH AND SEIZURE WARRANT**

I, Paul M. Smith, Task Force Officer ("TFO") with the United States Drug Enforcement

Administration ("DEA"), being first duly sworn, hereby deposes and states as follows:

**A. INTRODUCTION AND AGENT TRAINING AND EXPERIENCE**

1.      I make this Affidavit in support of an application for a search warrant for

information associated with certain accounts that is stored at premises owned, maintained,

controlled, or operated by DrChrono Inc., an electronic communications service and/or remote

computing service provider headquartered at 328 Gibraltar Drive, Sunnyvale, California, 94089,

in the Northern District of California, with servers located in Ashburn, Virginia, in the Eastern

District of Virginia.  The information to be searched is described in the following paragraphs and

in Attachment A.  This Affidavit is made in support of an application for a search warrant under

Title 18 United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require

DrChrono Inc. to disclose to the Government records and other information in its possession

pertaining to the subscriber or customer associated with the accounts, including the contents of

communications from the inception of the creation of the DrChrono Inc. account and any

documentation that predates the inception of the creation of the account, if any, in or on the

DrChrono Inc. server, through and including January 28, 2019.

1

2.      Your Affiant is a "Federal Law Enforcement Officer" within the meaning of Rule 41(a), Federal Rules of Criminal Procedure.   Your Affiant is a TFO employed by the DEA currently assigned to the Fort Smith, Arkansas, Post of Duty.   I have been employed by the DEA since March of 1997, after retiring from the Fort Smith Police Department ("FSPD") where I served as a certified law enforcement officer in the State of Arkansas for 28 years, spending 26 of those years in the FSPD Narcotic Unit.   For the past three years, I have been the 12th and 21st Judicial District Drug Task Force Commander, certified as a law enforcement officer in the State of Arkansas.   During the course of my employment as a law enforcement officer, I have gained experience in conducting drug investigations and have received the benefit of many years of such experience of fellow agents and officers.   Your Affiant has worked in an undercover capacity and has conducted investigations utilizing confidential sources.

3.      Your Affiant has also conducted investigations of controlled substance violations in conjunction with agents and officers from other jurisdictions, and conducted over 2,000 narcotics investigations involving, but not limited to: the manufacture of methamphetamine, cocaine, Xanax and marijuana; the distribution of methamphetamine, cocaine, LSD, oxycodone, hydrocodone, benzodiazepine, and numerous other controlled substances in cooperation with other local, state, and federal law enforcement agencies.   I have worked numerous controlled substance investigations involving health care professionals.   Your Affiant has completed numerous state and federal schools and seminars involving the investigation of narcotic violations, to include the investigation of pharmaceutical controlled substances.   I currently serve as a certified Law Enforcement Instructor for the State of Arkansas, and have served in this capacity for the past 21 years.   In this capacity, I provide and have provided training on drug investigations to well over 250 federal, state and local officers.

4.      Your Affiant has also conducted investigations involving money laundering and the seizure and forfeiture of assets.  As part of these investigations, your Affiant has interviewed the arrested subjects and their associates.  Through these interviews, your Affiant has learned how and why these offenders conduct various aspects of their drug trafficking activities, to include communicating, manufacturing, packaging, distribution, transportation and the concealment of controlled substances and assets and money laundering.  From all of this, I have gained considerable knowledge regarding illegal drug trafficking and pharmaceutical diversion.

5.      Pursuant to my employment with the DEA, I have investigated criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code Sections, 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections, 1956 and 1957.  Your Affiant is familiar with, and has employed, all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation, and undercover operations.

6.      In connection with drug trafficking investigations, your Affiant has participated in and/or executed numerous search warrants, including residences of drug traffickers/manufacturers and their co-conspirators/associates, stash houses used as storage and distribution points for controlled substances, and business offices used by drug dealers as "fronts" to conceal their unlawful drug trafficking activities and the proceeds obtained from unlawful drug trafficking.

7.      Your Affiant has participated in investigations involving the following types of drugs: oxycodone, hydrocodone, hydromorphone, cocaine, cocaine base, marijuana, and other controlled substances.  Your Affiant has also participated in Title III investigations.  Your Affiant has also interviewed numerous witnesses to, and participants in, drug trafficking organizations that illegally distribute prescription drugs who have described to me the techniques that they and other

organization members used to distribute and dispense controlled substances as well as to transport, conceal, or launder the illegal drug proceeds.

8.     As part of my training and experience, your Affiant is aware that certain controlled substances are often abused and illegally diverted from what would otherwise be considered legitimate medical uses.  In particular, opiate-based narcotics that are intended to legitimately treat chronic to moderately severe pain are often diverted and abused for the euphoric effect they produce, an effect similar to that associated with heroin use. Your Affiant also knows that individuals who abuse these types of drugs are at risk for becoming physically dependent on the drugs.

9.     Your Affiant has investigated and assisted with the investigation of individuals and organizations that illegally disburse or dispense controlled substances under the guise of operating seemingly legitimate medical clinics (colloquially known as "pill mills"). These "pill mills" generally operate as pain management clinics, emergency care or "urgent care" clinics, but the illegal disbursement of controlled substances can also occur at family practice clinics or other general medical practices.   Typically, an individual who seeks to abuse or illegally divert controlled substances will attend one of these medical clinics.  The physician at the medical clinic issues a prescription for a controlled substance, often without performing the minimal professionally required medical assessment of the patient's complaints, or properly evaluating whether disbursing the controlled substances is medically appropriate.  As a result, these clinics attract large numbers of individuals who often travel long distances seeking opioid and other controlled substance prescriptions from these physicians.  Additionally, it is not unusual in these investigations for the owners, staff, and physicians at the medical clinics to dispense the controlled

substances themselves, or to refer patients to particular pharmacies that are known to fill the illegitimate prescriptions for controlled substances.

10.     Because this Affidavit is being submitted for the limited purpose of establishing probable cause to search the place described in Attachment A for the items described in Attachment B, it does not include each and every fact known by me in this investigation but only facts I believe are sufficient to establish the requisite probable cause.

## B. PREMISES

11.     I make this Affidavit in support of an application for the issuance of a warrant to search for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by DrChrono Inc., an electronic communications service/remote computing service provider headquartered at 328 Gibraltar Drive, Sunnyvale, California, 94089, in the Northern District of California, with servers located in Ashburn, Virginia, in the Eastern District of Virginia (the "premises"). The information to be searched is described in the following paragraphs and in Attachment A. This Affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703 (c)(1)(A) to require DrChrono Inc. to disclose to the Government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications, from the inception of the creation of the DrChrono Inc. account and any documentation that predates the inception of the creation of the account, if any, in or on the DrChrono Inc. server, through and including January 28, 2019, further described in Attachment A, in order to seize fruits, instrumentalities, and evidence related to possible violations of Title 21, United States Code, Sections 841(a)(1) and 846, as there is

probable cause to believe that fruits, instrumentalities, and evidence of this crime (further described in Attachment B) will be found in a search of the premises.

### C.  JURISDICTION

12.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711.  Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated."  Title 18, United States Code, Section 2711(3)(A)(i).

### D.  APPLICABLE LAW AND DEFINITIONS

13.     Based on my training and experience, and the training and experience of other DEA diversion investigators, agents and other law enforcement officers, I know that:

14.     Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person knowingly or intentionally to distribute or dispense a controlled substance except as authorized by that subchapter.

15.     Title 21, United States Code, Section 841(a)(1) and 846 makes it unlawful for any person to knowingly and intentionally combine, conspire, confederate, and agree with each other and other persons known and unknown to distribute and to dispense, outside the scope of professional practice and not for a legitimate medical purpose, quantities of oxycodone, hydromorphone, and morphine sulfate, Schedule II controlled substances, and hydrocodone/acetaminophen, a Schedule III controlled substance until October 6, 2014, thereafter, a Schedule II controlled substance, and alprazolam, a Schedule IV controlled substance.

16.     Under Title 21, United States Code, Sections 822(a)(1) and (a)(2), and 21 C.F.R. 1301.11 and other regulations, a person who distributes or dispenses any controlled substance, or

who proposes to dispense any controlled substance, must obtain a registration from DEA every three years.

17.     Under 21 C.F.R. 1306.03, a prescription for a controlled substance may only be issued by a practitioner who is both authorized to prescribe in the jurisdiction in which he or she is licensed to practice his or her profession and registered with the DEA (unless otherwise exempt from registration).

18.     Under 21 C.F.R 1306.3(a)(1) and (2) and 21 C.F.R. 1306.4(a), a prescription for a controlled substance is only valid if it has been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

19.     By law, under 21 C.F.R. 1306.04(a), the responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding liability rests upon the pharmacist who fills a prescription.

20.     Pursuant to Title 21, United States Code, Section 881(a)(6), all moneys and things of value that were furnished or intended to be furnished in exchange for a controlled substance, that constitute proceeds traceable to such an exchange, or that were used or intended to be used to facilitate the sale or exchange of a controlled substance in violation of Title 21, United States Code, Section are subject to seizure and forfeiture to the United States.

21.     Pursuant to Title 21, United States Code, Section 881(a)(4), all vehicles that are used, or are intended for use, to transport, or in any manner facilitate the transportation, sale, receipt, possession or concealment of a controlled substance in violation of Title 21, United States Code, Section 841 are subject to seizure and forfeiture to the United States.

22.     Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957 is subject to forfeiture to the United States.

23.     Pursuant to Title 18, United States Code, Section 1957, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property having a value greater than $10,000.00, knowing that the property was derived from unlawful activity.

24.     By law, under 21 C.F.R. 1304.04, inventories and records of controlled substances listed in Schedule II shall be maintained separately from all other records maintained by the registrant.  Likewise, inventories and records of controlled substances in Schedules III, IV, and V must be maintained separately or in such a form that they are readily retrievable from the ordinary business records of the practitioner.   All records related to controlled substances must be maintained and be available for inspection for a minimum of two years.

25.     Other than medical records, it is standard practice for documents to be kept by medical offices in the normal course of business reflecting daily billing, accounts received, bank records, deposit receipts, telephone records, appointment books and sign in sheets.  These financial records and billing documents often contain evidence to establish that patients have consulted with the doctor or have received prescriptions from the doctor.  Further, prescription pads are normally kept in offices, exam rooms and laboratories of medical practices that prescribe controlled substances.

26.     Computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules and other information needed to operate a medical practice.

27.     By law, under 21 C.F.R. 1304.33, DEA registrants must submit information about all transactions in which a Schedule II or Schedule III-N (narcotic) controlled substance is acquired or distributed (i.e., from a supplier to a pharmacy).  The information is transmitted to DEA's Automation of Reports and Consolidated Ordering System (ARCOS) Unit on a quarterly basis and maintained in a DEA database.

28.     Based upon my training and experience, I know that Schedule II, III, and IV substances are sold in varying strengths and under various brand names.

29.     Based upon my training and experience, I know that the following types of Schedule II, III, and IV controlled substances are often subject to abuse:

a.      OxyContin® and Roxicodone® are brand names of Oxycodone, an opioid narcotic analgesic that is a Schedule II controlled substance;

b.      Methadone is an opiate narcotic analgesic that is a Schedule II controlled substance;

c.      Percocet® is the brand name of Oxycodone combined with Acetaminophen (APAP), an opioid narcotic analgesic that is a Schedule II controlled substance;

d.      Dilaudid® is the brand name of Hydromorphone, an opioid narcotic analgesic that is a Schedule II controlled substance;

e.      Opana® is the brand name of Oxymorphone, an opioid narcotic analgesic that is a Schedule II controlled substance;

f.      Lorcet/Lortab® is the brand name of Hydrocodone with Acetaminophen, an opioid narcotic analgesic and Schedule II-N controlled substance;

g.      Xanax® is the brand name of Alprazolam, a benzodiazepine used to treat anxiety and panic disorders and a Schedule IV controlled substance;

      h.      Soma® is the brand name of Carisoprodol, a muscle relaxer and a Schedule IV

controlled substance.

30.      Under 21 C.F.R. § 1306.05, prescriptions for Schedule II, III, and IV controlled

substances are required to be dated as of, and signed on, the day when issued and shall bear the

full name and address of the patient, the drug name, strength, dosage form (e.g., "2mg" or "80mg"),

quantity prescribed (e.g., "#120" or 120 tablets), directions for use, and the name, address and

registration number of the practitioner.

31.      As of August 8, 2018, Regulation No. 2 of the Arkansas Medical Practices Act

prohibits the "prescribing of excessive amounts of controlled substances to a patient including the

writing of an excessive number of prescriptions for an addicting or potentially harmful drug to a

patient. 'Excessive' is defined as the writing of any prescription in any amount without a detailed

medical justification for the prescription documented in the patient record."

32.      Based on my training and experience, I know that guidelines for prescribing various

opioids, including those described above, are measured in "morphine milligram equivalents" or

"MME".  According to Centers for Disease Control (CDC) guidelines, "when opioids are started,

clinicians should prescribe the lowest effective dosage.  Clinicians should use caution when

prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and

risks when considering increasing dosage to $\geq$ 50 morphine milligram equivalents ("MME")/day,

and should avoid increasing dosage to $\geq$ 90 MME/day or carefully justify a decision to titrate

dosage to $\geq$ 90 MME/day."

33.      CDC guidelines provide that "clinicians should avoid prescribing opioid pain

medication and benzodiazepines concurrently whenever possible. . . . concurrent use is likely to

put patients at greater risk for potentially fatal overdose... [and] a case-cohort study found

concurrent benzodiazepine prescription with opioid prescription to be associated with a near quadrupling risk of overdose death compared with opioid prescription alone."  Further, CDC guidelines state that "methadone would not be the first choice . . . . only clinicians who are familiar with methadone's unique risk profile and who are prepared to educate and closely monitor their patients, including risk assessment for QT prolongation and consideration of electrocardiographic monitoring, should consider prescribing methadone for pain."

34.    The universal pain assessment tool is intended to help patient care providers assess pain according to individual patient needs.  It is a combination of the "Verbal Descriptor Scale," the "Wong-Baker Facial Grimace Scale," and the "Activity Tolerance Scale."  The "Verbal Descriptor Scale: is 0-10, with 0 being no pain, 1-2 being mild pain, 3-6 being moderate pain, 7-9 being severe pain, and 10 being the worst pain possible.  The "Wong-Baker Facial Grimace Scale" ranges from 0, being alert/smiling, 1-2, being no humor, serious, flat, 3-4, being furrowed brow, pursed lips, breath holding, 5-6, being wrinkled nose, raised upper lips, rapid breathing, 7-8 being slow blink, open mouth, to 9-10, being eyes closed, moaning, crying.  The "Activity Tolerance Scale" ranges from no pain; can be ignored interferes with tasks; interferences with concentration; interferences with basic needs; to bedrest required.

35.    Based on my training and experience, indications that physicians at a medical clinic are issuing prescriptions for controlled substances outside the course of professional practice and without a legitimate medical purpose include, but are not limited to, the following:

a.    Cash-only business;

b.    No insurance accepted;

c.    Patients travel long distances (from out-of-county or out-of-state);

d.    Patients line up for appointments hours in advance;

11

e.      Appointments are not for a specific time;

f.      Patients travel in groups;

g.      High volume of patients going through the clinic;

h.      Cursory physical examination, or no physical examination, during initial and follow-up visits;

i.      Brief initial and follow-up visits;

j.      Doctor does not undertake an independent evaluation of patient (i.e., patient suggests or directs the medication to be prescribed);

k.      Doctor writes out prescriptions for controlled substances and places them in the patient's file prior to the patient's visit;

l.      Failing to treat patients with anything other than controlled substances;

m.      Failing to heed warnings by others that drug-seeking persons are trying to obtain controlled substances from the doctor;

n.      Patients who appear and behave in a manner consistent with abusing, or being addicted to, controlled substances;

o.      Patients engage in drug deals on clinic property or openly discuss diverting their prescriptions;

p.      Directing patients to particular pharmacies to fill their prescriptions;

q.      Pharmacies have stopped filling the physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions; and,

r.      Clinic owners/operators and employees are particularly aware of law enforcement or potential investigations.

36.    Based on my training and experience, reasons that a pharmacist would not dispense a controlled substance prescribed by a specific doctor include, but are not limited to, the following:

a.    A pharmacy receives an unusually high volume of prescriptions for controlled substances from the same physician;

b.    Pharmacist is aware that patients travel long distances to see a particular physician (who is not a highly sought-after specialist); and,

c.    Other pharmacies have stopped filling a particular physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions.

37.    Based on my training and experience, your Affiant also knows that:

a.    Pill mill clinic operators and other traffickers in prescription drugs often place assets in names other than their own to avoid detection by the Government and possible forfeiture of these assets by Government and law enforcement agencies;

b.    Pill mill clinic operators and other traffickers in prescription drugs often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by Government and law enforcement agencies. Even though these assets are placed in the names of other persons or entities, the pill mill clinic operators actually own and continue to use these assets and exercise dominion and control over them; and,

c.    Pill mill clinic operators will accumulate and maintain substantial amounts of proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when the clinic owner is not distributing drugs.

38.     Based on my training and experience, your Affiant knows that people involved in fraudulent schemes often maintain records of their crimes, both in hard copy and electronic format, even after the crime has been discovered.

39.     Based upon my training and experience, your Affiant knows that people involved in fraudulent schemes or illegal activities where cash money is obtained often keep these monies in their homes, businesses, or safety deposit boxes.

40.     Based upon my training, work experience, and life experience, your Affiant knows that people maintain personal financial records for long periods of time, including checking and savings account records, income tax returns, and safety deposit boxes, in their home either in traditional hard copy form or on an electronic device.

41.     Based upon my training and work experience, your Affiant knows that people involved in criminal activity that deals predominantly in cash, such as described throughout this Affidavit, will remove, or "skim" portions of the illegal proceeds and hide this cash in their homes, businesses, safety deposit boxes, vehicles, or secret compartments in those locations.

42.     Based upon my knowledge, training, and experience and consultation with other DEA personnel, your Affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer examiner in a laboratory or other controlled environment. This is true because of the following:

a.   The volume of evidence: computer storage devices (like hard disks, diskettes, tapes, laser disks, optical disk, CD-ROMs, PC Cards and USB flash drives) can store the equivalent of thousands of pages of information.

b.  If a suspect tries to conceal evidence of criminal activity; he or she might store that evidence in random order with deceptive file names, encrypt the data, or otherwise attempt to "hide" or "mask" the relevant data.  This may require searching authorities to examine all the stored data to determine which particular files are "evidence or instrumentalities of a crime."  This sorting process can take weeks or months, depending on the volume of data stored, and the method in which it is stored, and it would be impractical to attempt this kind of search on site.

c.  Additionally, if a suspect has attempted to delete, or remove from storage, evidence of criminal activity from computer storage devices, that evidence may still reside on the computer in the form of "residue."  Residue in this context is defined as the information present in unused file data.  Residue may consist of the files which have been erased, or file slack.  When a file is erased, the data from the file is not necessarily deleted.  The file may remain on the disk until it is overwritten by other data.  File slack can be defined as the space in the data area of a disk between the end of a file and the end of the last cluster allocated to the file.  Data found in "slack space" may have come from data in Random Access Memory (RAM) at the time the file was created or updated, or it may come from a file which previously had occupied the space.  It is possible to retrieve data from residue area which may be of evidentiary value.  Data found in residue areas may reside on the storage device long after the original file has been erased or removed.  The residue data will remain on the storage device until such time that the residue is overwritten, if ever.  Searching the residue areas of computer storage devices can prove to be time consuming and require analytical methods and techniques which are best performed in a laboratory or other controlled environment.

43.    Further, based upon my knowledge, training, and experience and consultation with other DEA personnel, your Affiant knows that searching computerized information for evidence and instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output (I/O) peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer examiner can accurately retrieve the system's data in a laboratory or other controlled environment.  This is true because peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many systems storage devices require particular In/Out devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data, as well as all related instruction manuals or other documentation and data security devices.  If after inspecting the In/Out devices, software, documentation, passwords, and data security devices, and methods in which the data has been stored, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, they will return these items within a reasonable time.

## E.  THE INVESTIGATION OF DR. DONALD EUGENE HINDERLITER AND DR. CECIL W. GABY

44.    Dr. Donald Eugene Hinderliter ("HINDERLITER") is licensed to practice medicine in the State of Arkansas pursuant to the provisions of the Medical Practices Act.  Dr. Cecil W. Gaby ("GABY") is licensed to practice medicine in the State of Arkansas pursuant to the provisions of the Medical Practices Act.

45.     In May 2017, DEA personnel received several anonymous complaints that HINDERLITER (DEA Registrant Number AH3868811), and GABY, a former pediatrician (DEA Registrant Number BG2277514), operated a pill mill under the name HINDERLITER PAIN CLINIC, at 1311 Fort Street, Suite A, Barling, Arkansas.  The anonymous complaints stated that HINDERLITER and GABY charged cash, prescribed hydrocodone and benzodiazepine in the same amounts to patients regardless of a particular patient's prognosis or need, and that patients traveled great distances within Arkansas and Oklahoma to be seen by HINDERLITER and GABY.

46.     At the initiation of the investigation, it was apparent that both HINDERLITER and GABY conducted their medical practice at the HINDERLITER PAIN CLINIC; however, on an unknown date in or about July 2018, GABY discontinued his employment at the HINDERLITER PAIN CLINIC and opened a new clinic, the GABY PAIN CLINC, located at 2408 South 51st Court, Suite F, Fort Smith, Arkansas.  The investigation revealed, as will be detailed below, that while GABY began a practice separate from HINDERLITER in the summer of 2018, the methods of practice of medicine of GABY did not vary from the time he was employed by or with HINDERLITER.  As will be demonstrated in the paragraphs that follow, it is my belief based on my training, experience, and knowledge of this and similar investigations that both HINDERLITER and GABY are distributing, dispensing, and conspiring with each other and others known and unknown to distribute and dispense controlled substances outside the scope of professional medical practice and not for a legitimate medical purpose.

**1)  Evidence provided by Doctor-1, a cooperating witness for the DEA familiar with the practices of HINDERLITER and GABY.**

17

47.     In April 2018, DOCTOR-1[1] contacted the DEA expressing concerns about a new patient previously treated by GABY. DOCTOR-1 stated that DOCTOR-1 was providing the information as a result of a previous request from a DEA agent that DOCTOR -1 report anything that DOCTOR-1 found inappropriate.  DOCTOR-1 reported that DOCTOR-1 had treated a patient who had been previously prescribed an "MME of 350" in addition to a prescription for Xanax 2 mg tablets.  DOCTOR-1 advised that the aforementioned prescription was for severe knee pain from a distant surgery with no described treatment plan or functional goals for the patient. DOCTOR-1 advised that the patient was seen by GABY at the HINDERLITER PAIN CLINIC but was currently a patient of DOCTOR-1.  DOCTOR-1 also stated that DOCTOR-1 had reduced the prescribed medication regimens of approximately five additional patients previously treated at the HINDERLITER PAIN CLINIC, and under the current care of DOCTOR-1, as they were often prescribed significant levels of Xanax. DOCTOR-1 provided additional information regarding GABY and HINDERLITER on an ongoing basis.  The information provided by DOCTOR-1 has been corroborated by a review of records, interviews of patients and witnesses, surveillance, and an analysis of HINDERLITER and GABY'S prescribing of controlled substances under the

---

[1] On or about December 13, 2013, DOCTOR-1 pled guilty to felony possession of meperidine (Demerol), in a Circuit Court in Arkansas, and was sentenced to 36 months suspended imposition of sentence, a fine in the sum of $3,500.00, and $170.00 court costs.  In April 2013 after DOCTOR-1's arrest which led to his felony conviction in December 2013, the Arkansas State Medical Board, in an Emergency Order, suspended DOCTOR-1's license based on alleged violations of the Medical Practices Act, more specifically that DOCTOR-1 a) violated the laws of the United States and the State of Arkansas regulating the possession, distribution and use of narcotic or controlled drugs, more specifically possessing and diverting fraudulent prescriptions for Schedule medication for personal use and for others; b) exhibiting habitual and intemperate and excessive use of narcotics or other habit-forming drugs; and c) violation of Regulation 2.5 by administering Schedule II narcotics to another.  In April 2013, DOCTOR-1 voluntarily surrendered DOCTOR-1's DEA registration for cause.  In February 2014, DOCTOR-1 was allowed to renew his medical license. In July 2015, DOCTOR-1 entered into a Memorandum of Agreement ("MOA") with the DEA which restored his DEA registration under certain conditions which included, among other things, that DOCTOR-1 would  submit quarterly printouts from the Arkansas Prescription Monitoring Program, as well as submit logs of all controlled substances prescribed; and abide by certain limitations regarding the prescribing of controlled substances. DOCTOR-1 must adhere to the requirements of the MOA until on or about September 30, 2020.  DOCTOR-1 was granted no promises or consideration in exchange for the information DOCTOR-1 reported to the DEA.

Arkansas Prescription Monitoring Program.   As such, I believe the information provided by DOCTOR-1 to be truthful and reliable.

48.     On June 4, 2018, law enforcement officers interviewed DOCTOR-1, who advised that HINDERLITER had previously offered DOCTOR-1 a position as a physician at a satellite office that HINDERLITER planned to open in Booneville, Arkansas.   DOCTOR-1 stated, however, that after speaking to patients of the HINDERLITER PAIN CLINIC one day in the lobby of the HINDERLITER PAIN CLINIC, DOCTOR-1 reported that DOCTOR-1 felt uncomfortable with HINDERLITER'S practice due to the volume of prescriptions the patients had claimed they were prescribed.  DOCTOR-1 stated that HINDERLITER and GABY prescribe 2 mg Xanax, three times daily, for each patient because "narcotics cause anxiety." DOCTOR-1 expressed DOCTOR-1's concern to HINDERLITER and GABY directly; however, neither HINDERLITER nor GABY appeared receptive to change this practice.    DOCTOR-1 declined the position at the HINDERLITER PAIN CLINIC due to the prescribing habits of the HINDERLITER PAIN CLINIC and DOCTOR-1's personal observations during DOCTOR-1's visit.

49.     DOCTOR-1 described the HINDERLITER PAIN CLINIC as a "dive" where HINDERLITER and GABY each have their own room, or "office" where they bring patients for a brief visit.  Furthermore, DOCTOR-1 stated that DOCTOR-1 believed the laboratory utilized by the HINDERLITER PAIN CLINIC was insufficient and related that the receptionist also serves as the laboratory technician.[2]   DOCTOR-1 stated that the receptionist does not provide adequate

---

[2] Based on my training and experience, Your Affiant is aware that drug screenings are routinely administered to patients by laboratory technicians to detect drug abuse or diversion and to assist in determining which patients are appropriate candidates for opioid pain therapy.  Based on my training and experience, Your Affiant is aware that there are measures clinics routinely take to ensure that a particular patient is unable to fabricate or falsify a particular urine specimen, to include, observing a patient providing a urine specimen.

supervision when conducting drug screenings and that to DOCTOR-1's knowledge, the receptionist had no formal training to be conducting the screenings.

50.     DOCTOR-1 stated that DOCTOR-1 believed that HINDERLITER was banned by Medicaid so, as a result, HINDERLITER conducts a cash only business, charging $125.00 per visit.[3] The receptionist, known to DOCTOR-1 as "Melody," confided in DOCTOR-1 that in the last six months (approximated to be the time period between on or about late 2017 to 2018), three patients of the HINDERLITER PAIN CLINIC suffered a fatal overdose.  Melody also informed DOCTOR-1 that the work environment at the HINDERLITER PAIN CLINIC was very negative and that she, Melody, is performing tasks that she is "not trained to do."  DOCTOR-1 described the situation as "unsafe" and advised that DOCTOR-1 sent new Department of Health regulations to GABY and GABY disregarded the new regulations.

51.     DOCTOR-1 stated that DOCTOR-1 currently treats approximately 30 or 40 former patients of the HINDERLITER PAIN CLINIC.  Pursuant to a DEA Administrative Subpoena, DOCTOR-1 provided the DEA with several patient files maintained by DOCTOR-1's clinic who were formerly treated by the HINDERLITER PAIN CLINIC.  A representative sample of the patient files are highlighted below:

52.     Specifically, DOCTOR-1's patient files dated April 12, 2018, reflected that D.D. (date of birth January 13, 1975) "[S]uffers daily pain in right knee since a motor vehicle accident in 2006 where [D.D.] sustained a severe tibial plateau fracture…most recently [D.D.] has been with GABY who maintained [D.D.] on an MME of 350 plus Xanax 2 mg three times daily and

---

[3] United States Department of Health and Human Services, Office of Inspector General, records reflect that effective October 17, 2012, HINDERLITER was, "excluded from participation in any capacity in Medicare, Medicaid, and **all** Federal health care programs as defined in section 1128B(f) of the Social Security Act," for a period of five years following HINDERLITER's misconduct related to billing discrepancies and the actual medical services rendered. HINDERLITER was required to pay a fine in the sum of $5,000.00.

then for the last three months [D.D.] was at PMO in Sallisaw where [D.D.'s]  MME was reduced to 180 and Xanax was stopped… [DOCTOR-1] told [D.D.] that [DOCTOR-1] would take [D.D.] on as a patient but only if [D.D.] agreed to no more than an MME of 180. …[D.D.] wanted to know why [DOCTOR-1] couldn't prescribe the same medications as GABY and [DOCTOR-1] spent a considerable amount of time explaining the reason's (sic), including the 4-fold increased risk of overdose when taking Xanax with oxycodone.  [D.D.] seems to understand and wants to move forward." A patient report prepared on April 12, 2018, reflected that GABY prescribed D.D. the following: 84 Alprazolam 2 MG Tablets, 168 Oxycodone HCL 30 MG Tablets (270.0 MME), and 140 Hydromorphone 4 MG Tablets (80.0 MME) on September 15, 2017, that were filled on that same day at a clinic whose shorthand code is reflected as "Princ" pharmacy in an unknown location; and 84 Alprazolam 2 MG Tablets, 168 Oxycodone HCL 30 MG Tablets (270.0 MME), and 140 Hydromorphone 4 MG Tablets (80.0 MME) on October 13, 2017, that were filled on that same day at a clinic whose shorthand code is reflected as "Princ" pharmacy in an unknown location.

53.     DOCTOR-1's patient files reflected that R.H. (date of birth August 23, 1977), "Reports good pain relief at doses given by GABY. Says [R.H.] left the state for Texas and when [R.H.] returned GABY would not see [R.H] again.  [R.H.] went through severe withdrawals and ended up in the Emergency Room several times."  DOCTOR-1's Assessment of R.H. reflects, "Chronic pain related to trauma as described in history.  [R.H] has been medicated at a level that I am completely uncomfortable continuing, given [R.H.'s] questionable history of getting medications in another state over the last year, any record of which we could not find."  Furthermore, the MME section indicates, "MME: Previously at 765.  I think a reasonable goal is 90-180 for this patient."  DOCTOR-1's treatment plan reflects, "[That DOCTOR-1] explained that

[DOCTOR-1] just could not continue the level of pain medications that [R.H.] was receiving from GABY.  We discussed the circumstances/reasons why [R.H.] had gotten to that level of treatment. [R.H.] says that [R.H.] just kept complaining of pain and [R.H.] was just given more and more. [DOCTOR-1] explained the reason's (sic) why xanax (sic) was not safe to continue and offered alternatives.  [DOCTOR-1] explained that [DOCTOR-1] did believe that [R.H.] needed pain relief and that there were many other therapies/resources that could be utilized.  [DOCTOR-1] went through many of these options but [R.H.] said that [R.H.] had tried them all and was not really interested in trying them again.  [DOCTOR-1] offered to help with oxycodone 20 mg four times daily but only if [R.H.] was compliant with other aspects of the treatment plan."

54.    DOCTOR-1's patient files reflected that C.I. (date of birth November 15, 1977) is a, "Patient [that is] disabled after having 2 back surgeries, the first in 2010 was an L4-5 fusion, the second was a redo after a fall in 2012.  The 2nd surgery only provided minimal relief and that lasted for only 2-3 months.  C.I. has since been in chronic pain management, the last one being with GABY in Barling.  [GABY] had [C.I.] on an MME of 302 plus xanax (sic) tid.  [C.I.] fell on hard times and could not afford to get [C.I.'s] medications or continue with GABY…. DOCTOR-1's Treatment Plan for C.I. indicates that "[DOCTOR-1] told [C.I.] that [DOCTOR-1] would be unable to continue an opioid dose close to what [C.I.] was getting from GABY and that xanax could not be started again either.  [C.I.] describes panic attacks and severe anxiety.  [DOCTOR-1] told [C.I.] that, unless a psychiatrist or PCP who is willing to coordinate care with [DOCTOR-1] prescribes it, [C.I.] would not be able to be on a benzodiazepine.  [DOCTOR-1] offered alternatives.  Given [C.I.'s] severe pain, radiculopathy, disability, poor function without pain relief, [DOCTOR-1 is] going to start [C.I.] at oxycodone 15 mg twice daily but contingent on [C.I.] getting a PCP in the next 1-2 months."  (See also pages 40-41.)

55.     DOCTOR-1's patient files dated May 10, 2018, reflected that T.E. (date of birth November 25, 1967) "[S]uffered many severe injuries in a motor vehicle accident in 1994.  Has had a total of 17 surgeries, many of which were on both knees, as a result of the severe traumatic injuries and having to be extricated from the vehicle… [T.E.] was treated by HINDERLITER for quite a while at an MME of 315 and was even on methadone for a while but then moved to Missouri and was treated in a pain clinic in Poplar Bluff.  That clinic reduced [T.E.'s] MME to 75 and [T.E.] did not do very well.  [T.E.] also sees a psychiatrist in Missouri for bipolar disease and is on Xanax 2 mg three times daily among other things.  [T.E.] still sees that phsyciatrist (sic) even though [T.E.] has moved back to Arkansas and would like to come to this clinic instead of HINDERLITER.  [DOCTOR-1] explained that it is not good for [T.E.] to see so many different doctors for pain management… [DOCTOR-1] told [T.E.] [DOCTOR-1] was not comfortable prescribing at the amount [T.E.] was getting from HINDERLITER.  [DOCTOR-1 will] only prescribe an MME of 75, the same as the pain clinic in Poplar Bluff."

56.     A patient record created on July 3, 2018, reflected that T.E. was prescribed multiple drugs by multiple prescribers over approximately one year.  With respect to some of the prescriptions prescribed by HINDERLITER, the patient record reflects for example, that HINDERLITER prescribed T.E. the following: 112 Oxycodone HCL 15 MG Tablets (90.0 MME) and 140 Oxycodone HCL 30 MG Tablets (225.0 MME) on January 2, 2018, which were filled that same day of January 2, 2018, at Health-Wise Pharmacy of Mansfield, Arkansas; 112 Oxycodone HCL 15 MG Tablets (90.0 MME) and 140 Oxycodone HCL 30 MG Tablets (225.0 MME) on December 4, 2017, which were filled at Health-Wise Pharmacy of Mansfield, Arkansas, on that same day of December 4, 2017; 112 Oxycodone HCL 15 MG Tablets (90.0 MME) and 140 Oxycodone HCL 30 MG Tablets (225.0 MME) on November 6, 2017, which were filled at Health-

Wise Pharmacy of Mansfield, Arkansas, on that same day of November 6, 2017; 112 Oxycodone

HCL 15 MG Tablets (90.0 MME) and 140 Oxycodone HCL 30 MG Tablets (210.0 MME) on

October 9, 2017, which were filled at Village Pharmacy in Ozark, Arkansas, on that same day of

October 6, 2017; 84 Methadone HCL 10 MG Tablets, (90.0 MME), 112 Oxycodone HCL 15 MG

Tablets (90.0 MME), and 112 Oxycodone HCL 30 MG Tablets (180.0 MME) on September 11,

2017, which were filled at Village Pharmacy in Ozark, Arkansas, on that same day of September

11, 2017; 84 Methadone HCL 10 MG Tablets, (90.0 MME), 112 Oxycodone HCL 15 MG Tablets

(90.0 MME), and 112 Oxycodone HCL 30 MG Tablets (180.0 MME) on August 14, 2017, which

were filled at Village Pharmacy in Ozark, Arkansas, on that same day of August 14, 2017.

57.     DOCTOR-1's patient files dated June 7, 2018, reflected that B.C. (date of birth

February 8, 1961), "complains of severe low back pain, non-radiating, which interferes with

ADL's.  [B.C.] was patient of HINDERLITER.  [B.C.] was [discharged as a patient of

[HINDERLITER] for testing positive for methamphetamine the end of May. [B.C.] denies ever

doing meth. [B.C.] says that the POC tests at HINDERLITER'S clinic were notoriously inaccurate

and begged him to send it to the lab for confirmation but he wouldn't do it and just [discharged

B.C.].  [B.C.] was given an Rx for less than half [B.C.'s] usual dose and [discharged].  [B.C.] is

extremely upset about it.  [DOCTOR-1] called HINDERLITER but his office was closed today.

DOCTOR-1 told [B.C.] that DOCTOR-1 would have to talk with or get notes from

HINDERLITER or see a confirmation that no methamphetamine was actually found or DOCTOR-

1 would be unable to help [B.C.]…If [B.C.] does end up as a patient here DOCTOR-1 would want

[B.C.] to try physical therapy and at least get evaluated by an interventional specialist before long."

58.     A patient report prepared on June 26, 2018, reflected that HINDERLITER

prescribed B.C. the following: 84 Alprazolam 0.5 MG Tablets and 112 Hydrocodone-

Acetaminophen 10-325 Tablets (40.0 MME) on March 8, 2018, which were filled at Rose Drug

of Russellville, Arkansas, on March 12, 2018; 84 Alprazolam 0.5 MG Tablets and 112 Oxycodone

HCL 10 MG Tablets (60.0 MME) on April 3, 2018, which were filled at Rose Drug of Clarksville,

Arkansas, on April 3, 2018; 84 Alprazolam 0.5 MG Tablets and 112 Oxycodone HCL 15 MG

Tablets (90.0 MME) on May 1, 2018, which were filled at Rose Drug of Clarksville, Arkansas, on

May 1, 2018; 84 Alprazolam 0.5 MG Tablets on May 29, 2018, which were filled at Rose Drug of

Russellville, Arkansas, on June 12, 2018, and 56 Oxycodone HCL 10 MG Tablets (30.0 MME)

on May 29, 2018, which were filled at Rose Drug of Clarksville, Arkansas, on May 29, 2018.

59.    DOCTOR-1 patient files reflected that A.I. (date of birth April 2, 1978), "Was told

[A.I] was too young for surgery but [DOCTOR-1] will try and get records verifying that.  [A.I.]

has been managed on long term opioids to help maintain some degree of normal functioning.

[DOCTOR-1] have reviewed [A.I's] PMP and discussed [A.I.'s] history with HINDERLITER.

He had [A.I.] on an MME of 360 plus xanax.  [DOCTOR-1] explained that this was more than

[DOCTOR-1] was comfortable with and that if [A.I.] wanted to return here we would have to

reduce that to 90-180 range and stop the xanax."

60.    DOCTOR-1's patient files reflected that S.E. (date of birth November 26, 1979),

"Had been with HINDERLITER on an MME of 270 plus clonazepam but says [S.E] didn't like

HINDERLITER and thought that he was going to retire any day leaving [S.E.] without pain

medications.  Had been looking for another pain clinic and found one in Roland, OK.  [S.E] went

there and the physician was a primary care doctor and could only prescribe oxycodone 20 mg three

times daily and said he would keep reducing it because he had to.  [S.E] stayed there for 2 months

and heard about this clinic and came here."

61.     Based upon my training, experience, and knowledge of this investigation, specifically the knowledge relayed above from DOCTOR-1, it is my belief that the practices of prescribing medications by HINDERLITER and GABY fall outside the scope of professional practice and are not for a legitimate medical purpose.

## 2) Surveillance of HINDERLITER and GABY Clinics and Interviews of Persons Familiar With HINDERLITER and GABY and Their Medical Clinics.

62.     On August 14, 2017, the DEA was telephonically contacted by M.B. who reported that a doctor in M.B.'s area named HINDERLITER was overprescribing prescription pain pills to M.B.'s spouse, identified as D.W. (born February 6, 1972), as well as other individuals M.B. knew in the area.  Specifically, M.B. reported that D.W. was receiving treatment from HINDERLITER for an old back injury D.W. sustained in a motor vehicle accident.   M.B. advised that HINDERLITER prescribed D.W. the following prescriptions on a monthly basis: 140 Hydrocodone/Acetaminophen 10/35 mg tablets; 140 Oxycodone 30 mg tablets; 84 Alprazolam 2 mg tablets.  M.B. stated that D.W. takes the aforementioned prescriptions and is then rendered unable to function.  M.B. indicated that D.W. constantly passes out on the floor after taking the aforementioned combination of medications and that D.W. has become so addicted to the Oxycodone tablets that D.W. has begun to use unconventional methods of administration such as snorting the tablets.

63.     M.B. reported that M.B. contacted HINDERLITER'S office on several occasions and spoke to both HINDERLITER and "his nurse" and that neither HINDERLITER nor his nurse seemed concerned about D.W.'s reaction to the medication.  M.B. advised that after several unsuccessful attempts to have D.W.'s medication changed or the dosage lowered M.B. decided to contact the DEA to file a complaint.

64.     On July 23, 2018, law enforcement officers conducted surveillance at the HINDERLITER PAIN CLINIC.  Surveillance was established at approximately 8:30 a.m., and it was observed that prior to employee arrival, approximately three patients were waiting in front of the HINDERLITER PAIN CLINIC.  Law enforcement officers observed a steady flow of vehicle traffic enter the HINDERLITER PAIN CLINIC parking lot, wherein individuals exited their vehicles and walked into the HINDERLITER PAIN CLINIC.   They further observed HINDERLITER arrive at 9:07 a.m., and Chelcie McClain, a HINDERLITER PAIN CLINC employee, arrive at 9:12 a.m., wearing medical scrubs.  Surveillance was conducted throughout the day on the comings and goings of patients.  At 5:20 p.m., HINDERLITER exited the HINDERLITER PAIN CLINIC and left the area.  At approximately 5:25 p.m., Chelcie McClain exited the HINDERLITER PAIN CLINIC and left the area.  Vehicle indexing by law enforcement officers revealed vehicles registered to individuals with addresses in Fort Smith, Charleston, Barling, Danville, Lavaca, Dardanelle, Van Buren, Cove, Greenwood, Subiaco, Russellville, and Waldron, Arkansas.  Based on my training, experience, and knowledge of this and similar investigations, it is my belief that the steady flow of traffic at the clinic and the diverse geography of the patients arriving at an out-of-town clinic specializing in pain management through the prescription of controlled substances is indicative of the clinic operating in a manner outside the scope of a professional medical practice and dispensing and distributing controlled substances without a legitimate medical purpose.

65.     On July 24, 2018, law enforcement officers conducted surveillance at the HINDERLITER PAIN CLINIC, beginning at approximately 8:55 a.m.  At that time, they observed three patients sitting on the sidewalk in front of the HINDERLITER PAIN CLINIC.  At 9:04 a.m. Chelcie McClain arrived, opened the HINDERLITER PAIN CLINIC, and the individuals waiting

outside on the sidewalk entered the clinic. Law enforcement officers observed vehicles arrive at the clinic and further observed HINDERLITER, arrive at approximately 9:14 a.m. Law enforcement officers observed a steady flow of traffic enter the HINDERLITER PAIN CLINIC parking lot. On some occasions, one individual would exit their vehicle, enter the clinic, and return to their vehicle shortly thereafter. On other occasions, more than one individual arrived in a particular vehicle and one person would enter, while one person stayed in the vehicle, or all of the occupants in a particular vehicle would exit the vehicle and enter the HINDERLITER PAIN CLINIC. Surveillance concluded at 11:22 a.m. on that same date of July 24, 2018.

66.     On an unknown date in or about July 2018, GABY discontinued his employment at the HINDERLITER PAIN CLINIC and opened a new clinic, the GABY PAIN CLINC, located at 2408 South 51st Court, Suite F, Fort Smith, Arkansas. On July 25, 2018, law enforcement officers conducted surveillance at the GABY PAIN CLINIC, beginning at approximately 10:15 a.m. As surveillance was being established, law enforcement officers observed Melody Jones, identified as the Officer Manager for the GABY PAIN CLINIC, standing in the entrance of the GABY PAIN CLINIC. At approximately 10:17 a.m., an individual exited a vehicle and walked to the front door of the GABY PAIN CLINIC and attempted to enter. The individual turned the door knob and found that it was locked. The individual walked back toward his vehicle when Melody Jones exited the GABY PAIN CLINIC and made contact with the male. Both Melody Jones and the individual entered the GABY PAIN CLINIC shortly thereafter.

67.     At approximately 10:25 a.m. an individual approached the GABY PAIN CLINIC on foot, knocked on the door and was allowed in by Melody Jones. Law enforcement officers observed individuals exit the GABY PAIN CLINIC and enter their vehicles that were parked in

the GABY PAIN CLINIC parking lot. Vehicle indexing by law enforcement officers revealed vehicles registered to individuals with address in Fort Smith, Paris, and Russellville, Arkansas.

68.     On July 27, 2018, law enforcement officers established surveillance at the GABY PAIN CLINIC beginning at approximately 7:30 a.m. At that time, they observed three vehicles parked in the GABY PAIN CLINIC parking lot. From the hours of 7:30 a.m. to approximately 9:30 a.m. on that same day of July 27, 2018, law enforcement officers observed multiple vehicles enter the GABY PAIN CLINIC parking lot, wherein people exited their vehicles, and returned to their vehicles shortly thereafter. For example, at 8:25 a.m. a gray Ford passenger car bearing Arkansas license plate 341380, and occupied by three people, entered the parking lot. Law enforcement officers observed two of the individuals exit the vehicle, enter the GABY PAIN CLINIC, and return to the gray Ford passenger car at 9:13 a.m.

69.     Of the many vehicles law enforcement observed in the GABY PAIN CLINIC parking lot on that same day of July 27, 2018, during the two-hour window wherein surveillance was conducted, vehicle indexing determined that several vehicles returned to individuals whose addresses where located throughout the state of Arkansas, to include addresses located in Fort Smith, Van Buren, North Little Rock, Booneville, Hot Springs National Park, and Fayetteville. Based on my training, experience, and knowledge of this and similar investigations, it is my belief that the steady flow of traffic at the clinic and the diverse geography of the patients arriving at an out-of-town clinic specializing in pain management through the prescription of controlled substances is indicative of the clinic operating in a manner outside the scope of a professional medical practice and dispensing and distributing controlled substances without a legitimate medical purpose.

70.     The investigation revealed that Melody Jones and Chelcie McClain were identified as paid staff of the HINDERLITER PAIN CLINIC.  A review of payment records and surveillance of both the HINDERLITER PAIN CLINIC and the GABY PAIN CLINIC conducted by law enforcement officers, indicated that Melody Jones and Chelcie McClain have been employed by either the HINDERLITER PAIN CLINIC and/or the GABY PAIN CLINIC for over one year. Based on surveillance of the HINDERLITER PAIN CLINIC during the week of July 23, 2018, to July 27, 2018, no other staff other than HINDERLITER and Chelcie McClain appeared to be present at the HINDERLITER PAIN CLINIC.  Based on surveillance of the GABY PAIN CLINIC during the week of July 23, 2018, and July 27, 2018, no other staff other than GABY and Melody Jones appeared to be present at the GABY PAIN CLINIC.

71.     Law enforcement officers contacted the Arkansas State Board of Nursing (ASBN) representative to verify whether Melody Jones and/or Chelcie McClain were registered as licensed practical nurses or registered nurses through the ASBN.  A check of www.NURSYS.com, a nationwide license verification system for nurses, conducted by the ASBN representative, determined that neither Melody Jones nor Chelcie McClain were registered as licensed practical nurse or registered nurse in Arkansas.

72.     On August 13, 2018, at approximately 11:40 a.m. law enforcement officers visited several pharmacies located in the Fort Smith area in an attempt to obtain information related to HINDERLITER, GABY, the HINDERLITER PAIN CLINIC and the GABY PAIN CLINIC.  Law enforcement officers established contact with A.R., a pharmacist employed by Walmart located at 2214 Fayetteville Road, Van Buren, Arkansas.  A.R. stated that physicians at the HINDERLITER PAIN CLINIC often write combination prescriptions for patients to include, narcotics, benzodiazepines, and sedatives.  A.R. further stated that groups of patients from the

30

HINDERLITER PAIN CLINIC would show up to the pharmacy where A.R. was employed trying to fill prescriptions right after the narcotics shipment was received, as if the groups of patients knew when Walmart received the narcotics.  A.R. intimated that most HINDERLITER PAIN CLINIC patients had the same doses and medications regardless of their treatment and that high quantities of medications were being prescribed.  A.R. advised that GABY wrote higher quantities on a more frequent basis than HINDERLITER and that A.R. has seen very few physicians writing these combinations of medications, especially at this quantity and with this volume.  A.R. stated that oncologists are normally the physicians that prescribe these doses of medications for cancer patients, but very rarely do general practitioners.  A.R. stated that A.R. is a part-time employee of Midland Drug, Inc., another pharmacy in Fort Smith, and has seen similar HINDERLITER PAIN CLINIC prescriptions there.  A.R. stated that HINDERLITER and GABY have been flagged for concern due to the prescriptions HINDERLITER and GABY prescribe, and both HINDERLITER and GABY appear on Walmart's "Do Not Fill List," which prevents Walmart's pharmacists from filling HINDERLITER'S and GABY'S prescriptions at their pharmacy.

73.    On August 13, 2018, at approximately 2:15 p.m., law enforcement officers made contact with J.P., a pharmacist employed by Walmart located at 1101 West Ruth Avenue, Sallisaw, Oklahoma.   J.P. informed law enforcement officers that he/she was familiar with the HINDERLITER PAIN CLINIC, HINDERLITER and GABY.  J.P. stated that HINDERLITER was blocked from billing Medicare/Medicaid due to previous charges related to fraudulent billing. J.P. was unaware of specific details, but J.P. had knowledge as a result of J.P.'s previous dealings with HINDERLITER.

74.    J.P. stated that J.P. believed that HINDERLITER moved to a "cash clinic" due to a lack of income at another practice.  J.P. stated that J.P. had recently refused to fill a prescription

from the HINDERLITER PAIN CLINIC. Specifically, J.P. refused to fill the prescription because it was prescribed by GABY, a pediatrician, to an adult patient, traveling a long distance, for a large quantity of narcotics and the prescription did not meet the scope of practice. J.P. stated that HINDERLITER and GABY have been flagged for concern due to the prescriptions HINDERLITER and GABY prescribe and both HINDERLITER and GABY appear on Walmart's "Do Not Fill List," which prevents Walmart's pharmacists from filling HINDERLITER'S and GABY'S prescriptions at their pharmacy.

75.    On August 13, 2018, law enforcement officers established contact with S.S. Law enforcement officers learned from S.S. that S.S. has worked for the same business in the same office building since the 1990s. S.S. stated that S.S is familiar with the GABY PAIN CLINIC as the GABY PAIN CLINIC is a tenant in the office building where S.S.'s business has also been a tenant since the 1990s. S.S. stated that the GABY PAIN CLINIC moved in to the office building on approximately July 4, 2018, and that to S.S.'s knowledge, the GABY PAIN CLINIC employs GABY and one other person. S.S. identified this GABY employee as Melody, who S.S. believes is a secretary, who S.S. has observed leaving the GABY PAIN CLINIC on foot, with GABY, or via public transportation.

76.    S.S. related that S.S. arrives at work at approximately 9:00 a.m., and that the GABY PAIN CLINIC is typically already open for business. S.S. stated that the GABY PAIN CLINIC conducts the majority of the day's business during the morning hours. S.S. stated that before the GABY PAIN CLINIC was a tenant of S.S.'s office building, S.S. arrived at work earlier than 9:00 a.m., but S.S. does not feel comfortable arriving to work early because of GABY PAIN CLINIC'S "clientele." By this, S.S. further advised that "the area did not have the riff raff it does now." S.S. stated that "everything has changed since the GABY PAIN CLINIC moved into the office

building." S.S. reported that other staff and tenants of the office building routinely left their vehicle windows down, their vehicles unlocked, and their office doors unlocked during business hours. S.S. reported that now, S.S.'s office locks their office door on a regular basis and always lock their vehicles to prevent theft.

77.     S.S. stated that most of the GABY PAIN CLINIC patients arrive at roughly the same time in the morning and wait to see GABY.  S.S. stated that it is not uncommon to see 30 patients a day coming in and out of the GABY PAIN CLINIC.  S.S. stated that S.S. has observed groups of people or couples show up together when visiting the GABY PAIN CLINIC.  S.S. stated that it is not uncommon to see multiple people traveling in the same vehicle, and that sometimes they stay a while, while other times they are "in and out."

78.     S.S. stated that S.S. has observed vehicles bearing out-of-state vehicle license plates in the GABY PAIN CLINIC parking lot, but that not all of the vehicles bearing out-of-state vehicle license plates are necessarily visiting the GABY PAIN CLINIC.  S.S. stated that patients of the GABY PAIN CLINIC are often seen hanging out in the parking lot, smoking and/or loitering and/or waiting for the individuals they arrived with who had not finished their visit with GABY. S.S. described the GABY PAIN CLINIC as "a revolving door of people."  S.S. related that because of S.S.'s tenure in the office building, S.S. is familiar with other businesses in the immediate vicinity, to include a neighboring neck and back clinic that S.S. described as having a low volume of patients.

79.     S.S. stated that S.S. has seen drivers take groups in to the GABY PAIN CLINIC to get prescriptions and expressed concerns that "three different generations of people are out in the middle of the day visiting the GABY PAIN CLINIC and are not at work."  S.S. described one truck S.S. observed in particular that was occupied by three males and one female ranging in age

from 20s to 60s, wherein all of the occupants entered the GABY PAIN CLINIC, presumably for treatment.

80.     S.S. advised that some GABY PAIN CLINIC patients seem legitimate and S.S. has observed them using canes and wheel chairs to assist with mobility, but S.S. stated that the majority of people that S.S. has observed enter the GABY PAIN CLINIC walk normally and look like "junkies." S.S. stated that the GABY PAIN CLINIC typically keeps the door to the GABY PAIN CLINIC locked even when the clinic is open for business and that the clinic displays a sign asking visitors to "knock."

81.     S.S. described one incident wherein a truck full of people arrived at the GABY PAIN CLINIC and a verbal argument ensued in the parking lot between the truck's occupants. S.S. stated that S.S. opened the front door of S.S.'s office and asked the truck's occupants "Are you looking for the pill doctor?" The truck's driver replied, "Yes." S.S. then stated that S.S. pointed to the GABY PAIN CLINIC'S door and stated, "He's over there." The truck's driver replied, "Thanks." S.S. stated that S.S. refers to GABY as the "pill doctor" for two reasons. Namely, because the majority of people walk out of the GABY PAIN CLINIC with prescriptions and because of S.S.'s conversations with M.T. a United States Postman regarding GABY because M.T. shares the same sentiment.

82.     Specifically, S.S. stated that S.S. and M.T. have spoken at length regarding their growing concerns over the GABY PAIN CLINIC. S.S. stated that M.T. advised that the GABY PAIN CLINIC did not send or receive any mail. Furthermore, according to S.S., "Melody" has "loose lips" when M.T. inquired about the GABY PAIN CLINIC and the GABY PAIN CLINIC'S alternative pain treatments. According to S.S., Melody advised M.T. that the GABY PAIN

CLINIC only writes prescriptions and offers no other form of treatment.  S.S. stated that it is S.S.'s belief that GABY is contributing to the opioid epidemic and it angers S.S.

83.     On August 14, 2018, at 12:00 p.m., law enforcement officers made contact with S.A., a pharmacist employed by Walgreens located at 2701 Rogers Avenue, Fort Smith, Arkansas. S.A. informed law enforcement officers that he/she was familiar with the HINDERLITER PAIN CLINIC, HINDERLITER and GABY.  S.A. stated that HINDERLITER was on Walgreens "Red Flag" list for not prescribing properly and for writing large quantities of narcotics, regardless of the treatment.  S.A. advised that S.A. refuses prescriptions from the HINDERLITER PAIN CLINIC and HINDERLITER quite frequently but that some prescriptions are filled on a patient by patient basis if Walgreens and/or S.A. is able to verify further.  S.A. stated that S.A. is not the Pharmacist in Charge of that particular Walgreens location, but rather is employed as a "floater pharmacist" and has observed the same prescriptions from the HINDERLITER PAIN CLINIC at the other Walgreens locations where S.A. works at in Fort Smith.

84.     On August 21, 2018, at approximately 8:08 a.m., law enforcement officers acting in an undercover capacity telephonically contacted the GABY PAIN CLINIC in reference to patient requirements.  The telephone call was answered with the introduction, "GABY PAIN CLINIC, this is Melody," believed to be Melody Jones.  The undercover law enforcement officer asked the individual who identified herself as Melody if the GABY PAIN CLINIC was accepting new patients to which she responded, "No."  The individual who identified herself as Melody then instructed the undercover law enforcement officer to call the GABY PAIN CLINIC back in two weeks.  The undercover law enforcement officer asked Melody what the new patient requirements were to which Melody advised that the first office visit was $200.00 and $120.00 for each office visit thereafter.  Melody further advised that the GABY PAIN CLINIC did not accept insurance

and that the clinic required a paper copy of a CT scan, X-Ray or MRI administered within the last 6 years upon the first office visit. The telephone call was then terminated.

85.     On August 30, 2018, law enforcement officers interviewed M.T., a mailperson with the United States Postal Service (USPS). M.T. reported that he/she has worked for the USPS for 18 years and is familiar with the GABY PAIN CLINIC because the GABY PAIN CLINIC is on the same delivery route that M.T. has served for the last 6 or 7 years. M.T. stated that M.T. has serviced the GABY PAIN CLINIC since it opened in July of 2018. M.T. described the business to law enforcement officers as unusual in that the GABY PAIN CLINIC did not send or receive mail on a regular basis, which, in M.T.'s opinion was "extremely rare." Specifically, M.T. reported that the GABY PAIN CLINIC may receive one piece of mail in any given week, which is typically "junk" mail and recalled one occasion wherein the GABY PAIN CLINIC had one piece of outgoing mail.

86.     M.T. stated that the GABY PAIN CLINIC'S work schedule appeared to be "odd" in that it did not operate with set hours or on a set schedule. Furthermore, M.T. described a sign displayed on the door to the GABY PAIN CLINIC that reads, "We are here, knock loudly," but indicated that the sign is not always displayed, even when the clinic is open for business. M.T. stated that even when the GABY PAIN CLINIC is open for the business, the front door typically remains locked.

87.     M.T. reported that on the days that the clinic is open for business, the parking lot is filled with people, some loitering and others waiting to visit with GABY. M.T. indicated that the patients of the clinic sign in to the clinic using an iPad, and then return outside where they can smoke and carry on. M.T. reported that the patients of the GABY PAIN CLINIC show up by the carload, often times with one driver and three passengers. M.T. stated that sometimes the driver

of the vehicle enters the clinic, other times the driver of the vehicle remains in the car while the other occupants of the vehicle enter the clinic.

88.     M.T. stated that the patients at the GABY PAIN CLINIC "do not fit in in the area" and "do not look like the people" M.T. sees at the pain clinic where M.T. has been treated for back pain.  Specifically, M.T. reported that M.T. suffered back injuries related to work that resulted in three back surgeries, physical therapy and continued weekly injections.   Specifically, M.T. explained that M.T. rarely sees a "legitimate-looking patient" and described the patients at the GABY PAIN CLINIC as "tweakers" and "red flag" patients.

89.     On one occasion, M.T. asked the GABY PAIN CLINIC receptionist, later identified by M.T. via photograph as Melody Jones, about the treatment the GABY PAIN CLINIC offered. Melody Jones informed M.T. that the GABY PAIN CLINIC did not do physical therapy or injections because injections could paralyze you.   Instead, the GABY PAIN CLINIC just prescribed pain pills for treatment.  M.T. stated M.T. was alarmed by Melody Jones's response. M.T. stated on some of the days when M.T. encounters Melody Jones she acts like M.T.'s best friend, and, that other days when M.T. encounters Melody Jones, she appears withdrawn as if she is possibly under the influence.

90.     On October 1, 2018, the DEA received a telephone call from L.P., an employee of Premise Health, in Fort Smith, who stated that he/she was conducting a liver enzyme test on T.V., a patient.  Specifically, L.P. stated that they were discussing the risks of taking large quantities of narcotics containing acetaminophen after reviewing T.V.'s prescription monitoring program report that indicated that T.V. receives 168 Oxycodone HCL 30 mg Tablets and 112 Oxycodone/Acetaminophen 5/325 mg Tablets on a monthly basis.  T.V., stated that he/she was not concerned because he/she does not take the majority of the medication he/she receives.  T.V.

informed L.P. that T.V. gives the pills to T.V.'s significant other, M.V., instead of taking them and T.V. stated that T.V. just took a few "here and there."

91.     L.P. determined that T.V. was a patient at the GABY PAIN CLINIC and was treated by GABY on a monthly basis.  L.P. stated that L.P. attempted to contact GABY about the information T.V. relayed but L.P. was unable to reach the clinic after multiple attempts.  The DEA further confirmed via the prescription drug monitoring program that T.V.'s significant other, M.V., received medication from GABY on a monthly basis, with a prescription for 28 Clonazepam 1 mg Tablets, 180 Oxycodone 30 mg Tablets, 168 Oxycodone 10 mg Tablets and a separate prescription for 16 Oxycodone HCL 10 mg Tablets filled at Anderson's Discount Pharmacy in Fort Smith.

92.     On October 3, 2018, law enforcement officers conducted an interview of C.B., an individual currently on Arkansas state parole at the Arkansas Community Corrections Office in Russellville, Arkansas, as C.B. was determined to be a patient of HINDERLITER.[4]  During the interview, C.B. was informed that C.B. was not under arrest and free to leave at any time.  C.B. agreed to speak with agents and an interview was conducted.  C.B. was granted no promises or consideration in exchange for the information C.B. reported.  Specifically, C.B. stated that C.B. was no longer under the care of a pain management doctor and had stopped taking pain medications.  C.B. stated that C.B. had not seen HINDERLITER for approximately 6 months but that when C.B. was a patient of HINDERLITER'S, C.B. had seen HINDERLITER every 28 days for approximately one year.  C.B. related that C.B. had to take C.B.'s previous medical records from a previous provider and a copy of C.B.'s last MRI to the HINDERLITER PAIN CLINIC. C.B. stated that a doctor referred C.B. to HINDERLITER after C.B. was diagnosed with Fibromyalgia and C.B. could not get in to a clinic in Conway, Arkansas.

---

4 C.B.'s criminal history includes but is not limited to arrests and/or criminal convictions for theft, battery, narcotics trafficking offenses, firearms offenses, and possession of drug without prescription.

93.     In describing a typical appointment with HINDERLITER, C.B. stated that upon arrival, C.B. paid $120.00 for the first visit and $100.00 for each visit thereafter. C.B. reported that the receptionist would administer a urine drug screening and take C.B. to see HINDERLITER in what C.B. described as HINDERLITER'S office. C.B. stated there was no examination table in the office; C.B. would sit in a chair, and no physical examination was ever administered. C.B. stated C.B. would tell HINDERLITER that C.B.'s pain was 8 out 10 and that Oxycodone worked best for C.B. C.B. stated that C.B. was prescribed Oxycodone 30 mg Tablets, Oxycodone 15 mg Tablets, and Xanax. After picking up C.B.'s prescription from the receptionist at the front desk, C.B. would fill the prescriptions at Newton's Pharmacy located in Russellville. C.B. stated that HINDERLITER increased C.B.'s dosage by request and did not offer any alternative therapies. According to C.B., HINDERLITER never counseled C.B. on the dangers of taking narcotics and sedatives simultaneously. C.B. stated that C.B. had an insurance provider which C.B. used to fill prescriptions but could not use it at the HINDERLITER PAIN CLINIC because the HINDERLITER PAIN CLINIC was a cash only business. C.B. stated that HINDERLITER discharged C.B. from his care after C.B. tested positive for methamphetamine after a routine urine drug screening.

94.     On October 4, 2018, law enforcement officers conducted an interview of M.S., an individual currently on Arkansas state parole at the Alma, Arkansas, Police Department, as M.S. was determined to be a patient of GABY.[5] During the interview, M.S. was informed that M.S. was not under arrest and free to leave at any time. M.S. was granted no promises or consideration in exchange for the information M.S. reported. M.S. stated that M.S. is a former patient of GABY and that the last time M.S. saw GABY was July 6, 2017, just prior to being sent to the Arkansas

---

[5] M.S.'s criminal history includes but is not limited to arrests and/or criminal convictions for burglary, theft, hot check violations and narcotics trafficking offenses.

Department of Corrections.  M.S. stated that M.S. acquired pharmaceutical narcotics from a physician and a chiropractor at a clinic in Roland, Oklahoma, who operated a pill mill that was utilized by numerous people to acquire pharmaceutical narcotics for distribution or abuse.  M.S. admitted that during this time period, M.S. was abusing and selling pharmaceutical narcotics on the "street."

95.     M.S. stated that through M.S.'s associations with others involved in the illicit distribution of pharmaceutical narcotics, M.S. learned that GABY and HINDERLITER ran a "pill mill" in Fort Smith.  As such, M.S. scheduled an appointment with GABY.  According to M.S., the receptionist informed M.S. to bring an X-ray or old medical records to M.S.'s appointment with GABY and that the first appointment would be $125.00 in cash and that M.S. would be required to take a urinalysis.

96.     M.S. stated that during M.S.'s first visit with GABY, M.S. brought in an MRI that was 7 years old.  M.S. stated that GABY did not review the X-ray and conducted a very brief physical examination within GABY'S actual office.  At this time, M.S. was informed that M.S. would provide a urine specimen to the receptionist and pay the $125.00 for the visit.  M.S. stated that GABY requested M.S.'s medical records but M.S. stated that M.S. never provided them to GABY.  M.S. stated that at M.S.'s first visit, GABY wrote M.S. prescriptions for Roxicodone 20 mg, Roxicodone 10 mg, and a muscle relaxer.  M.S. stated that M.S. subsequently talked GABY into prescribing M.S. methadone in addition to the aforementioned narcotics.

97.     M.S. stated that M.S. had an appointment with GABY every 28 days to get prescriptions for Roxicodone 20 mg, Roxicodone 10 mg, and a muscle relaxer (and sometimes, methadone).  M.S. stated that at each appointment, M.S. paid $100.00 in cash and provided a urine specimen behind closed doors without being monitored by anyone on GABY'S staff.  M.S. stated

that GABY knew people were bringing in urine that would test for the same narcotics prescribed and M.S. admitted that M.S. had utilized a friend's urine who took Roxicodone and muscle relaxers in order to pass the urinalysis. According to M.S., M.S. would leave the urine specimen in a vile wrapped in a hand warmer.

98.     M.S. stated that shortly after M.S.'s initial visit with GABY, M.S. stopped using Roxicodone and began to distribute all of the pills acquired by GABY to users in the Fort Smith/Alma area. Specifically, M.S. estimated that from May 2016 to July 2017, all of the pharmaceutical narcotics M.S. acquired from GABY were distributed to M.S.'s customer base in the Northwest Arkansas area. M.S. stated that on each prescription, M.S. earned approximately $5,000.00 to $7,000.00 in profit selling the pills on the street.

99.     M.S. stated that M.S. began bringing other potential patients to GABY to include M.S.'s immediate family to allow for them to acquire pharmaceutical narcotics. M.S. stated that GABY never followed up on pain levels, did not conduct additional physical examinations, and did not seek alternative treatment methods. M.S. stated, "I didn't need all the Roxi's from [GABY]. He doesn't care. [GABY] runs a pill mill and with $125.00 a person can obtain any amount of pharmaceutical narcotics. This is known to everyone in the pill world."

100.    On October 4, 2018, law enforcement officers conducted an interview of C.I., an individual currently on Arkansas state parole at the Arkansas Community Corrections Office in Russellville, Arkansas, as C.I. was determined to be a former patient of HINDERLITER and GABY.[6] During the interview, C.I. was informed that C.I. was not under arrest and free to leave at any time. C.I. was granted no promises or consideration in exchange for the information C.I. reported. C.I. agreed to speak with agents and an interview was conducted.

---

[6] C.I.'s criminal history includes but is not limited to arrests and/or criminal convictions for forgery, hot checks, endangering the welfare of a minor, and narcotics trafficking offenses.

101.    C.I. stated that C.I. is currently a patient of DOCTOR-1 but has seen HINDERLITER and GABY in the past and estimated that C.I.'s last visit with GABY was in approximately June of 2017. C.I. stated that after C.I. went to prison, C.I. no longer sought medical care from HINDERLITER or GABY.

102.    C.I. stated that C.I. was a patient of the Wild Horse Pain Clinic but was referred to HINDERLITER in approximately 2015 after being given a list of pain management providers in the area. C.I. stated that C.I. had a diagnosis for Lupus and had trouble with prior back surgeries. C.I. stated that C.I. was first treated by HINDERLITER but then became a patient of GABY because HINDERLITER was not "listening" to C.I. C.I. stated that neither HINDERLITER nor GABY did a physical examination on C.I. throughout the duration of C.I.'s treatment and reported that C.I. was never supervised when C.I. had to submit a urine specimen. C.I. described the HINDERLITER PAIN CLINIC as a "revolving door" of people and stated that several people would ride together to the clinic for their appointments.

103.    C.I. described a typical appointment with GABY and stated that small talk would ensue followed by GABY writing prescriptions. C.I. stated that C.I. believed that C.I.'s prescriptions were written out before C.I.'s appointment with GABY. C.I. stated that C.I. did not think C.I. needed the amount of medication C.I. was prescribed. C.I. stated that C.I. tried to stop taking Oxycodone and attempted to switch to Dilaudid but GABY would not do it. C.I. stated that C.I. filled the prescriptions at Anderson's Discount Pharmacy in Fort Smith after Harp's Pharmacy (unknown location) questioned the prescriptions. C.I. admitted that C.I. sold C.I.'s prescriptions for Xanax and that other HINDERLITER and GABY patients sold the medications they were prescribed as well. C.I. also stated that C.I. was aware of patients of GABY that fatally overdosed on prescription medications.

104.     The preceding paragraphs reveal that both the HINDERLITER and GABY clinics conduct business in several ways which based on my training, experience, and knowledge of this and similar investigations lead me to believe that both HINDERLITER and GABY are engaged in the distribution and dispensary of controlled substances outside the scope of a professional medical practice and not for a legitimate medical purpose.  The evidence which strongly leads me to this belief includes, but is not limited to: the clinics operating on a cash-only basis; the clinics servicing patients from a wide geographic area; the clinics operating only during limited days and times, and while open, employing a locked door where patients must knock to enter; the clinics seemingly not offering any other form of treatment aside from the prescribing of controlled substances; the clinics reportedly lacking little or any medical equipment; patients arriving in groups for treatment; the seeming lack of proper procedures for urinalysis of patients and reported instances of patients providing false samples for urinalysis; and the clinics being placed on "do not fill" lists for major pharmacies, such as Walmart and Walgreens.

3)     **Non-Fatal Overdose and Deaths of Patients Treated by HINDERLITER and GABY Due to the Prescribing of Controlled Substances Outside the Scope of a Professional Medical Practice.**

105.     The investigation revealed that on November 21, 2016, the police officers with the Muldrow, Oklahoma, Police Department received a possible overdose call regarding 56-year-old G.S.  The Muldrow, Oklahoma, Police Department Incident Report indicates that, "Upon arrival [police officers found G.S.] incoherent and unresponsive sitting in a chair at the kitchen table. EMS was arriving right behind [the police officers] and [police officers] could tell [G.S.] was breathing.  On the table, [police officers] noticed three empty prescription bottles, two syringes, and a spoon with residue of a bluish tint.  These items were seized via plain view after [G.S.'s] mother, [M.E.], invited [the police officers] in to check on [G.S.].  EMS arrived and attempted to

inject [G.S.] with Narcan into [G.S.] but could not hit a vein.  They then gave the Narcan nasally.  [G.S.] was taken by ambulance to St. Edwards Hospital. The bottles [police officers found] were by several Doctors but the scheduled substances were issued by [GABY].  [Police officers] checked online and called the numbers which was Sparks Pediatrics who stated that [GABY] no longer worked there and had been terminated.  [Police officers] then went to Muldrow Pharmacy where [they] obtained [G.S.'s] recent medications, 84 2 mg Xanax, 112 Oxycodone 30, and 112 Hydrocodone with ibuprofen 7.5/200, on Thursday, November 17, 2016.  The spoon was sent off for testing and the syringes were placed in a disposal container for destruction.  [Police officers] will attempt to make contact with [GABY] and the Arkansas Medical Board."[7]

106.    The investigation revealed that 31-year-old M.H. was a patient of GABY.  On or about July 20, 2017, GABY prescribed M.H. 22 Oxycodone HCL 10 MG Tablets (MME 55.0); 50 Oxycodone HCL 30 MG Tablets (225.0 MME), 90 Oxycodone HCL 10 MG Tablets (58.7 MME), and 56 Alprazolam 2 MG Tablets, which was filled on that same date of July 20, 2017, at Anderson's Discount Pharmacy in Fort Smith.  M.H. died on July 24, 2017.  On or about July 25, 2017, a Medical Examination was conducted by the State Crime Laboratory, Medical Examiner Division, in Little Rock, Arkansas, following the death of M.H. in Sebastian County, Arkansas.  Specifically, the cause of death was determined to be "Bronchopneumonia due to Mixed Drug Intoxication" and the manner of death was determined to be "Accident."  The Opinion of the Medical Examiner Division stated that, "[I]n consideration of the circumstances of death and after autopsy of the body, it is our opinion that M.H., a 31-year-old [], died of bronchopneumonia due to mixed drug intoxication.  The agency responsible for the investigation of [M.H.'s] death was the Sebastian County Coroner's Office.  They reported that [M.H.] was found unresponsive at

---

[7] G.S. is currently being treated as a patient by DOCTOR-1.

[M.H.'s] residence.  [M.H.] was transported to a local hospital where [M.H.] was declared deceased.  At autopsy, there was a laceration of the lateral right eyebrow.  It is unclear how this was incurred.  No associated craniocerebral trauma was present.  No other trauma was seen.  No significant gross natural disease was found which would be associated with unexplained death. Microscopic evaluation of the organ systems revealed bronchopneumonia and evidence of past intravascular drug abuse.  Toxicological studies showed a fatal combination of oxycodone and alprazolam with a small amount of diphenhydramine and promethazine."

107.    The investigation revealed that 48-year-old J.M. was a patient of HINDERLITER. On or about July 24, 2017, HINDERLITER prescribed J.M. 112 Oxycodone HCL 15 MG Tablets (90.0 MME), 56 Hydrocodone-Acetaminophen 10-325 (20.0 MME) and 84 Clonazepam 1 MG Tablets, which were filled on that same date of July 24, 2017.  J.M. died on August 16, 2017.  On or about that same date of August 17, 2017, a Medical Examination was conducted by the Oklahoma Board of Medicolegal Investigations Office of the Chief Medical Examiner in Tulsa, Oklahoma, following the death of J.M. in Muldrow, Oklahoma.  The Opinion of the Office of the Chief Medical Examiner stated that, "The cause of death is sepsis due to bacteremia.  Other significant conditions are cellulitis of the left hip, intravenous drug abuse and acute intoxication by alprazolam and hydrocodone.  The manner of death is classified as accident."

108.    The investigation revealed that 44-year-old T.M. was a patient of GABY.  On or about September 22, 2017, GABY prescribed T.M. 140 Oxycodone HCL 15 MG Tablets (112.5 MME), 112 Hydrocodone-Acetaminophen 5-325 Tablets (20.0 MME), and 84 Alprazolam 2 MG Tablets, which were filled on September 25, 2017, at the Hudson Pharmacy (unknown location). On September 28, 2017, the Muldrow, Oklahoma, Police Department was dispatched to T.M.'s residence regarding a possible overdose.  Upon arrival, police officers encountered T.M.'s wife,

P.M. who escorted police officers into a bedroom.  Once there, police officers observed that T.M. was deceased and lying on the floor near the bed.   The Muldrow Police Department Incident/Offense Report reflects that "[P.M.] advised that [P.M.] believed [T.M.] took too many of [T.M's] medications.  [P.M.] advised that [T.M's] doctor GABY, had the previous day upped [T.M.'s dosage of Oxycontin.  [P.M.] further advised that [P.M.] believed [T.M.] took 4 oxy pills last night at one time.  [P.M.] advised that [T.M.] has abused [T.M.'s] medications in times past and that [T.M.] was currently taking Oxycontin and Xanax for depression and anxiety.  [P.M.] advised that [T.M.] was nearing a 14 day incarceration period that [T.M.] was not wanting to do. [] The only stated medical issues besides depression and anxiety was hypertension, pre-diabetes, and a gastric bypass conducted in Feb."

109.    The Muldrow Police Department Incident/Offense Report further reflects that, "Part of the conversation with [P.M.] was that [T.M.] saw GABY in Barling, AR for pain pills.  I asked what [T.M.'s] pain was for and [P.M.] said fibromyalgia.  I asked where the pills were located and [P.M.] stated in a lock box under the bed.  I asked why and [P.M.] stated that they had children but also because [T.M.] abused them. [] The contents were as follows: Bottles with GABY Date Received Present/Prescribed Pill: 09/25 12/140 15 mg Oxycodone; 09/25 35 15 mg Oxycodone;  09/25 32/112 5/325 Hydrocodone;  09/25/ 64/84 Gabapentin;  09/25/ 31/84 Alprazolam; Dr. Clouse 06/17/ 60/60 Lisinopril 20 mg; 09/20/ 10/30 Citalopram; 8/17 16/20 Amoxicillin 875 mg; Unknow (sic) doctor: 1 Amitrypiline Tablet []."

110.    On or about September 29, 2017, a Medical Examination was conducted by the Oklahoma Board of Medicolegal Investigations Office of the Chief Medical Examiner in Tulsa, Oklahoma, following the death of T.M. in Muldrow, Oklahoma.  The Opinion of the Office of the Chief Medical Examiner stated that, "T.M. a 44 year old [], died as a result of Combined Drug

Toxicity (Oxycodone, Hydrocodone, Alprazolam, and Citalopram).   Cardiomegaly and Hypertension contributed to [T.M.'s] demise.  Manner of Death: Accident."

111.   The investigation revealed that 46-year-old D.S.W. was a patient of GABY.  On or about December 22, 2017, GABY prescribed D.S.W. 168 Oxycodone HCL 30 MG Tablets (270.0 MME), 112 Hydrocodone-Acetaminophen 10-325 (40.0 MME), 84 Alprazolam 2 MG Tablets, which was filled on that same date of December 22, 2017 at Anderson's Discount Pharmacy in Fort Smith.  D.S.W. died on December 24, 2017.  On or about December 27, 2017, a Medical Examination was conducted by the State Crime Laboratory, Medical Examiner Division, in Little Rock, Arkansas, following the death of D.S.W in Sebastian County.  Specifically, the cause of death was determined to be "Mixed Drug Intoxication" and the manner of death was determined to be "Accident."  The Opinion of the Medical Examiner Division stated that "[I]n consideration of the circumstances of death and after autopsy of the body, it is our opinion that D.S.W., a 46-year-old, [], died of mixed drug intoxication.  The agencies responsible for the investigation of [D.S.W.] death were the Sebastian County Coroner's Office and Fort Smith Police Department.  They reported that [D.S.W.] was found unresponsive in [D.S.W.'s] bed.  When EMS arrived, it was obvious that [D.S.W.] had died.  Death was pronounced at the scene by the Coroner.  At autopsy, no external or internal trauma was present.  The heart was enlarged and there were emphysematic blebs of the lungs.  Microscopic evaluation of the organ systems revealed no processes which would be associated with sudden death.  Toxicological studies revealed multiple drugs.  The benzodiazepines, clonazepam and alprazolam were present.  The antidepressants trazodone and citalopram, along with quetiapine and diphenhydramine were found as well.  None of the drugs were present were at levels suggested of purposeful overdose.  The combination of opioid narcotics and benzodiazepines would produce a fatal respiratory depression."

112.    The evidence has demonstrated a number of commonalities that exist amongst each of the examples of patient deaths recounted above.  In each instance, the patient was being treated by either HINDERLITER or GABY and the patient died from overdose of controlled substances, oftentimes within days of having received a prescription from the respective doctor.  In all cases recounted above, the patient was relatively young at the time of their death and was suffering from no ailment or disease which would account for death standing alone.  Moreover, in each instance relayed above, the patient was not under the influence of any controlled substances, to include illicit street narcotics, aside from the medications prescribed by HINDERLITER or GABY.  Based on my training, experience, and knowledge of this and similar investigations, it is my belief based on the overdose deaths caused by controlled substances outlined above that HINDERLITER and GABY are engaged in the distribution and dispensary of controlled substances outside the scope of a professional medical practice and not for a legitimate purpose.

113.    On November 6, 2018, at approximately 9:22 a.m., law enforcement officers executed a federal search warrant at the GABY PAIN CLINIC, located at 2408 South 51st Court, Suite F, Fort Smith, Arkansas, 72903[8].  During the execution of the search warrant, law enforcement officers determined that GABY and/or the GABY PAIN CLINIC utilized DrChrono Inc. to assist in GABY'S medical practice.  Although law enforcement officers obtained forensic images of the information stored using the DrChrono Inc. service during the execution of the search warrant, a user-friendly version of this same information is requested in the instant Affidavit.

114.    On November 19, 2018, the DEA sent DrChrono Inc. a preservation letter requesting DrChrono Inc. to take all necessary steps to preserve all records and other evidence in

---

[8] The Affidavit in the original federal search warrant, Case No. 2:18-CM-00019-MEF, is incorporated in this search warrant Affidavit as if set out word for word herein. Additionally, on that same date of November 6, 2018, a federal search warrant was also executed at the HINDERLITER PAIN CLINIC located at 1311 Fort Street, Suite A, Barling, Arkansas, 72923, (*See also*, Case No. 2:18-CM-00020-MEF).

the possession of DrChrono Inc. as it pertained to the account belonging to Dr. Cecil GABY dba

GABY PAIN CLINIC, 2408 South 51st Court, Suite F, Fort Smith, Arkansas, 72903.

115.     In general, providers like DrChrono Inc. ask each of their subscribers to provide

certain personal identifying information when registering for a DrChrono Inc. account.   This

information can include the subscriber's full name, physical address, telephone numbers and other

identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment

(including any credit or bank account number).   Providers typically retain certain transactional

information about the creation and use of each account on their systems.   This information can

include the date on which the account was created, the length of service, records of log-in (i.e.,

session) times and durations, the types of service utilized, the status of the account, and other log

files that reflect usage of the account.   In addition, providers often have records of the Internet

Protocol address ("IP address") used to register the account and the IP addresses associated with

particular logins to the account.   Because every device that connects to the Internet must use an IP

address, IP address information can help to identify which computers or other devices were used

to access the account.

116.     In some cases account users will communicate directly with a provider about issues

relating to their account, such as technical problems, billing inquiries, or complaints from other

users.   Providers typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by

the provider or user as a result of the communications.

### 4)     Prescription Monitoring Program (PMP) Data Analysis for HINDERLITER and GABY.

117.     The Arkansas Electronic Prescription Monitoring Program (PMP) was authorized

in 2011 by Arkansas State Legislature Act 304.   The Arkansas Department of Health (ADH)

oversees the operation of the PMP which is a database that collects and stores prescribing and dispensing data for controlled substances in Schedules II, III, IV, and V and any other drugs specified by Arkansas law as amended. Arkansas law requires that each dispenser of controlled substances shall submit, by electronic means, information regarding each controlled substance prescription dispensed to an individual in a timely fashion. The collection of data began March 1, 2013, and the data is maintained indefinitely. The following data is captured by the PMP:

- Patient's First and Last name
- Patient's address including City, State and Zip Code
- Patient's DOB
- Dispending Pharmacy's DEA number
- Dispending Pharmacy's name
- Dispensing Pharmacy's address including City, State and Zip Code
- Dispensing Pharmacy's Store ID number
- Date prescription was written
- Date prescription was filled
- Name of dispensed controlled substance
- Prescription number
- Schedule of controlled substance dispensed
- How many refills are available
- Drug category (Sedative, Narcotic etc.)
- Payment type (Private Pay, Medicare, Comm Insurance, Other)
- Quantity Dispensed
- Units dispensed (ml, mg)
- Number of Days of Supply
- MME's per day
- Prescriber's DEA number
- Prescriber's First and Last name
- Prescriber's address including City, State and Zip Code

118.   The PMP maintains procedures to ensure that the privacy, confidentiality, and security of patient information collected, recorded, transmitted, and maintained is not disclosed except as provided in Act 304. In 2015, Act 304 was amended to provide access to prescription data without a search warrant as part of an authorized investigation to certified law enforcement prescription drug diversion investigators of qualified law enforcement agencies.

119.    As part of the investigation of HINDERLITER, the DEA reviewed PMP data relevant pertaining to the medical practice of HINDERLITER and GABY from July 11, 2016 through July 11, 2018, with the following results:

- GABY prescribed 1,156,044 dosage units of Schedule II Controlled Substances to 347 patients (3,332 pills per patient over the course of 2 years) with an average MME of 136.
- HINDERLITER prescribed 832,994 dosage units of Schedule II Controlled Substances to 462 patients (1,803 pills per patient over the course of 2 years) with an average MME of 108.
- 98% of GABY'S patients were prescribed at least one opioid agonist (hydrocodone, oxycodone, methadone, etc.).
- 98% of HINDERLITER'S patients were prescribed at least one opioid agonist (hydrocodone, oxycodone, methadone, etc.).
- 94% of GABY'S patients receive either multiple narcotics or a combo of narcotics and sedatives.
- 78% of HINDERLITER'S patients receive either multiple narcotics or a combo of narcotics and sedatives.
- 60% of HINDERLITER'S patients have criminal history (equal to 261 patients); 29% have past drug charges (equal to 127 patients)
- 28 of HINDERLITER'S patients receive Methadone in combination with multiple narcotics or sedatives.
- 27% of GABY'S patients were age 40 or younger (equal to 88 patients).
- 28% of HINDERLITER'S patients were age 40 or younger (equal to 122 patients). Of these patients, 60% received a combination of prescription narcotics and sedatives
- Cash was the most popular payment type for individuals receiving prescriptions at the clinic from both physicians.

120.    Based on my training, experience, and knowledge of this and similar investigations, it is my belief that the data obtained from the Arkansas PMP is indicative of HINDERLITER and GABY operating medical clinics and distributing and/or dispensing controlled substances outside the scope of professional medical practice and not for a legitimate medical purpose.

### F.  INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

121.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular, Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require DrChrono Inc. to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, Government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### G.  CONCLUSION

122.    PMP data from July 2016 to July 2018, along with witness interviews and a limited patient file review, medical examiner reports, surveillance, as well as the execution of a federal search warrant at the GABY PAIN CLINIC, presents probable cause to believe that GABY prescribed Schedule II, III and IV controlled substances, in particular opioids, outside the usual course of professional practice and without a legitimate medical purpose.  Based upon the foregoing and upon my training and experience, I submit that there is probable cause to believe that the premises described as DrChrono Inc., an electronic communications service and/or remote computing service provider headquartered at 328 Gibraltar Drive, Sunnyvale, California, 94089, in the Northern District of California, with servers located in Ashburn, Virginia, in the Eastern District of Virginia, contains fruits, instrumentalities, and evidence related to possible violations of Title 21, United States Code, Section 841(a)(1), to wit, prescribing controlled substances outside the course of professional practice and without a legitimate medical purpose as well as possible violations of Title 21, United States Code, Section 846, to wit, conspiracy to prescribe controlled substances outside the course of professional practice and without a legitimate medical purpose.

I swear under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Paul M. Smith, Task Force Officer
Drug Enforcement Administration

Sworn to before me this _28_ day of January, 2019.

Honorable Mark E. Ford
United States Magistrate Judge